IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JULIO C. SANCHEZ,

    Plaintiff,

v.

DALLAS ANDRUSS, et al.,

    Defendants.
_____/

No. C 10-3213 MMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before the Court is defendants Sherri Kinney ("Kinney"), Dallas Andruss ("Andruss"), John Vanderhoofven ("Vanderhoofven"), and Glenn Kelley's ("Kelley") motion for summary judgment, filed January 15, 2013. Plaintiff has filed opposition to the motion with respect to Kinney, Andruss, and Vanderhoofven (collectively, "defendants"), but does not oppose the motion with respect to Kelley. Defendants have replied thereto. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

## BACKGROUND[2]

On July 23, 2008, the date on which the incidents giving rise to the instant action took place, all of the defendants were employed as correctional officers at Pelican Bay

---

[1] By order filed May 7, 2013, the Court deemed the matter appropriate for decision on the parties' respective filings and vacated the hearing scheduled for May 10, 2013.

[2] Unless otherwise noted, the facts discussed below are undisputed.

State Prison ("PBSP") and plaintiff was housed in the PBSP Administrative Segregation Unit ("ASU"),[3] having been found to have participated in a December 31, 2007 riot between two rival gangs, the Nortenos (Northern Hispanics) and the Surenos (Southern Hispanics). (See Sanchez Decl. ¶¶ 2, 18.)[4][5] During the riot, plaintiff was stabbed by Norteno inmates, and, "at the time of the incident in July of 2008," there was an "ongoing war between the Surenos and Nortenos (see Sanchez Decl. ¶ 22), resulting in "an enormous amount of tension in the ASU . . . amongst the inmates from the Surenos and the Nortenos" (see Sanchez Decl. ¶ 23). Consequently, inmates held in the ASU were housed by gang affiliation, and plaintiff was designated as affiliated with the Surenos. (See Sanchez Decl. ¶¶ 4-5.)

On July 23, 2008, Andruss and Kinney were "working as . . . Correctional Officer[s]" in the ASU. (See Andruss Decl. ¶¶ 1-2; Kinney Decl. ¶¶ 1-2). That same date, Vanderhoofven was "working as the Control Booth Officer" in the ASU (see Vanderhoofven

---

[3] According to PBSP's Operational Procedures (see Price Decl., filed Apr. 13, 2013, Ex. 103 (setting forth procedures to be followed by correctional officers working in ASU)), the purpose of the ASU is to provide "safe and secure segregated housing separate from the general population for inmates classified as a threat to the safety and security of the institution, present a threat to their own safety, or the safety of others; or whose continued presence in the general inmate population would jeopardize the integrity of an investigation into alleged serious misconduct or criminal activity" (see id. at 103-1).

Defendants' objection to said document on hearsay grounds is OVERRULED. Because, as discussed infra, defendants' state of mind is at issue here, any instructions or information received by correctional officers pertaining to the purpose of, and procedures governing, the facility are relevant with respect thereto. See United States v. Norwood, 798 F.2d 1094, 1097 (7th Cir. 1986) (noting "[w]hen it is proved that [a declarant] made a statement to [a party], with the purpose of showing the probable state of mind thereby induced in [the [party], . . . the evidence is not subject to attack as hearsay") (internal quotation and citation omitted).

[4] All references to plaintiff's declaration are to the revised version, filed April 15, 2013.

[5] Defendants request the Court strike from the record as untimely plaintiff's revised declaration. In a declaration filed concurrently therewith, plaintiff's counsel acknowledges said opposition evidence was due by April 12, 2013, but states plaintiff's initial declaration needed to be revised when a witness declined to provide a declaration as anticipated, and that although he sent a new declaration to plaintiff on April 5, 2013, he did not receive the complete, revised version back from the prison until April 15, 2013. (See Price Decl., filed Apr. 15, 2013, ¶¶ 6-7.) Under such circumstances, the Court will consider the April 15, 2013 revised declaration.

2

Decl. ¶¶ 1-2); the Control Booth is located "above the building's rotunda" and approximately fifty feet from plaintiff's cell (see Vanderhoofven Decl. ¶ 5).

In considering whether to house two inmates together, PBSP screens potential cellmates for compatibility through a process that can take up to two weeks. (See Sanchez Decl. ¶ 32.) On July 23, 2008, plaintiff was housed in cell D-08, and his cell-mate was Manuel Robledo ("Robledo"), also a Sureno. (See Sanchez Decl. ¶¶ 3, 32.) Outside the cell, there was a plaque that listed both their names. (See Sanchez Decl. ¶ 15.) That morning, Robledo was taken to a hearing before the Institutional Classification Committee ("ICC"), and plaintiff was left alone in his cell. (See Sanchez Decl. ¶ 19.)

During the time Robledo was absent from plaintiff's cell, Andruss and Kinney were asked to escort another inmate, Aguilar,[6] back to his cell from an ICC hearing. (See Andruss Decl. ¶ 3.) Aguilar's cell, D-09, was located next to plaintiff's cell. (See Andruss Decl. ¶ 7.) Upon arriving at cell D-08, Andruss told Aguilar to face the wall while plaintiff turned around with his back to the cell door and was placed in handcuffs through the cuff port in the door. (See Andruss Decl. ¶ 5-6.) After plaintiff was cuffed, he was instructed to move to the back of the cell. (See Andruss Decl. ¶ 6.) Andruss then called to the Control Booth and asked Vanderhoofven to open cell D-08. (See Andruss Decl. ¶ 7.) Vanderhoofven opened the cell door, allowing Aguilar to enter, and then closed the door, after which Aguilar backed up and placed his hands through the cuff port. (See Andruss Decl. ¶ 9.) Andruss uncuffed Aguilar, who immediately began attacking plaintiff. (See Andruss Decl. ¶ 9, 11.)[7]

Once the attack began, Kinney and Andruss, pursuant to their training, yelled for the inmates to stop fighting and to get down and warned that failure to do so would result in the

---

[6] No party has provided said inmate's full name nor is it otherwise apparent from the record before the Court.

[7] According to defendants, plaintiff turned around and looked at Aguilar while Aguilar was being uncuffed, and said nothing. (See Andruss Decl. ¶ 9). According to plaintiff, he followed instructions to face the wall and did not turn around until attacked. (See Sanchez Decl. ¶ 26.)

3

use of pepper spray. (See Andruss Decl. ¶ 12; Kinney Decl. ¶¶ 12-13; Andruss Supp'l Decl. ¶ 7.) Vanderhoofven heard the yelling and "activated [his] personal alarm to summon more custody staff, and used [his] radio to inform Central Control there was a cell fight in D-Section." (See Vanderhoofven Decl. ¶ 7). When Aguilar did not cease his attack, Kinney and Andruss each administered two bursts of pepper spray (see Kinney decl. ¶¶ 12, 13; Andruss Decl. ¶¶ 14, 16), after which Aguilar stopped attacking plaintiff (see Kinney Decl. ¶ 13).

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." See Celotex, 477 U.S. at 324 (internal quotation and citation omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted). "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." See Matsushita, 475 U.S. at 587 (internal quotation and citation omitted). Further, "if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge

1  must assume the truth of the evidence set forth by the nonmoving party with respect to that
2  fact." See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th
3  Cir. 1987).

## DISCUSSION

Plaintiff's complaint asserts a single claim under 42 U.S.C. § 1983, alleging a violation of his Eighth Amendment rights. By the instant motion, defendants seek summary judgment, on the following asserted grounds: (1) the Eleventh Amendment bars suit against defendants in their official capacities; (2) defendants did not violate plaintiff's Eighth Amendment rights; and (3) defendants are entitled to qualified immunity.

### A. Official Capacity

Defendants seek summary judgment to the extent they are sued in their official capacities.[8] The Eleventh Amendment bars suits in federal court for damages or injunctive relief against a state or an arm of the state. See Franceschi v. Schwartz, 57 F.3d 828, 831 (1995). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office . . . , [and], [a]s such, it is no different from a suit against the State itself." See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).

Accordingly, to the extent they are sued in their official capacities, defendants are entitled to summary judgment.

### B. Eighth Amendment Violations

Defendants argue they are entitled to summary judgment on each of the theories on which plaintiff bases his claim: deliberate indifference and failure to intercede. The Court addresses each theory in turn.

#### 1. Deliberate Indifference

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates, which has been interpreted to include a duty to protect

---

[8] Plaintiff does not address this argument in his opposition.

5

prisoners." Labatad v. Corr. Corp. of Am., 714 F.3d 1155, 1160 (9th Cir. 2013) (citing Farmer v. Brennan, 511 U.S. 825, 832-33 (1994). Prison officials violate the Eighth Amendment when they "act[ ] with deliberate indifference to the threat of serious harm or injury to an inmate." See Labatad, 714 F.3d at 1160. To establish deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . must also draw the inference." See Farmer, 511 U.S. at 837. Liability exists only where a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." See Id. at 847.

### a. Kinney and Andruss

#### (i) Placement of Aguilar in Plaintiff's Cell

Plaintiff contends Kinney and Andruss were deliberately indifferent to his safety by placing Aguilar in his cell. He asserts said defendants knew Aguilar was not his cell-mate and belonged to a rival gang, and, given the earlier prison riot between the Nortenos and Surenos, the ongoing war between the gangs, and PBSP's practice of housing inmates by gang affiliation, that they knew that putting Aguilar in a cell with plaintiff while plaintiff was handcuffed would result in injury to him.

In support of the instant motion, Kinney and Andruss have submitted declarations stating they were not familiar with plaintiff or Aguilar, were unaware of their gang affiliations, and did not know Aguilar was housed in a neighboring cell. (See Kinney Decl. ¶¶ 3-5, 16; Andruss Decl. ¶¶ 3-5, 10.) Defendants state they thought D-08 was Aguilar's cell because he told them he was housed in the D Section (see Andruss Decl. ¶¶ 3-4; Kinney Decl. ¶¶ 4-5), and because, upon arriving in the D Section, Andruss looked at Aguilar, who "nodded his head in the direction of cell D-08" (see Andruss Decl. ¶ 4), after which Andruss looked at the name plaque for the cell, noted it had two Hispanic names listed, saw only one Hispanic inmate in the cell, and thought Aguilar was housed therein (see Andruss Decl. ¶ 5).

6

In opposition, plaintiff has submitted a declaration in which he states Kinney and Andruss "escort[ed] [plaintiff] on a daily basis" (see Sanchez Decl. ¶ 9),[9] and that Kinney was the correctional officer who "personally arranged the cell move for Robledo and [plaintiff]" (see Sanchez Decl. ¶ 32),[10] during which procedure Kinney went to plaintiff's cell "with Robledo's information," including his picture, gave plaintiff "the assurance [Robledo] was a Southern Hispanic" (see Sanchez Decl. ¶ 32), and, along with Andruss, thereafter escorted Robledo and plaintiff to a "one man cage" for a compatibility meeting (see Sanchez Decl. ¶ 33). Further, Kinney herself states that she had at least twenty-eight contacts with plaintiff between February 12, 2008 and April 24, 2008 (see Kinney Supp'l Decl. ¶ 7)[11] and at least twenty-one contacts with Robledo before April 24, 2008 (see Kinney Supp'l Decl. ¶ 8). Additionally, plaintiff states that, earlier on the day of the subject accident, he overheard Andruss speaking to both Aguilar and Robledo in their respective cells, telling them about their upcoming ICC appointments. (See Sanchez Decl. ¶ 38.)[12] [13]

---

[9] Kinney and Andruss dispute plaintiff's assertion that they regularly escorted plaintiff. Specifically, Kinney and Andruss argue plaintiff's Record of Daily Activity for January 1, 2008 to September 1, 2008, attached as Exhibit A to Kinney's supplemental declaration, shows he was not escorted regularly by either of them. The signatures of the correctional officers on plaintiff's Record of Daily Activity, however, are illegible, and, in any event, such evidence merely serves to create a triable issue as to the frequency with which plaintiff was escorted by Kinney and Andruss.

[10] With her reply, Kinney has submitted a supplemental declaration in which she states she was not the correctional officer responsible for introducing plaintiff and Robledo. (See Kinney Supp'l Decl. ¶ 6.) As noted, however, all disputed facts must be taken in the light most favorable to the nonmoving party.

[11] Kinney states that, on April 24, 2008, she "took over the position of Disciplinary Officer," after which she "did not see to the daily activities of the inmates in ASU, and very rarely assisted with escorts." (See Kinney Supp'l Decl. ¶ 5.)

[12] Although plaintiff does not expressly state the conversations took place on the date in question, from his description thereof, read in context, a reasonable inference to such effect can be drawn.

[13] Defendants, interpreting said paragraph as asserting what Aguilar heard, object on the basis of plaintiff's lack of personal knowledge. (See Defs.' Objections to Pl.'s Evidence in Opp'n to Mot. for Summary J. at 7:3-7.) The Court, however, understands the paragraph, albeit not a model of clarity, to set forth a declaration of what plaintiff himself heard. Accordingly, defendants' objection is OVERRULED.

7

1    The above-referenced declarations as to defendants' prior contacts with plaintiff, Robledo, and Aguilar constitute sufficient circumstantial evidence from which a reasonable trier of fact could infer that both Kinney and Andruss were familiar with plaintiff and Robledo, and knew Aguilar was not plaintiff's cell-mate, yet nonetheless placed him in plaintiff's cell. See Farmer, 511 at 842 (holding "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence"). From such purposeful act, reflecting a violation of regular prison procedure, and in the absence of any evidence suggesting a necessity for taking such action, a reasonable inference can be drawn that Kinney and Andruss acted either with deliberate indifference to or with the intent to facilitate the assault that followed immediately thereafter.

Accordingly, to the extent plaintiff's claim is based on Kinney and Andruss's placement of Aguilar in plaintiff's cell, Kinney and Andruss are not entitled to summary judgment.

**(ii) Use of Pepper Spray**

Plaintiff also argues that Kinney and Andruss, even if they were not aware of the risk of harm to plaintiff by placing Aguilar in his cell, "were . . . deliberately indifferent in using pepper spray instead of taking decisive action to protect [plaintiff] from imminent serious injury." (See Opp'n at 24:11-12.) "[C]orrectional officers who are present during a violent altercation between prisoners are not deliberately indifferent if they intervene with a due regard for their safety." See Shields v. Dart, 664 F.3d 178, 180-81 (7th Cir. 2011) (affirming summary judgment in favor of correctional officer; finding no deliberate indifference where, upon observing stabbing of inmate by two other inmates, officer called for backup and waited for it to arrive rather than opening door or trying to stop attack); see also MacKay v. Farnsworth, 48 F.3d 491, 492-93 (10th Cir. 1995) (affirming summary judgment in favor of prison guards; finding no deliberate indifference where guards, upon observing plaintiff being stabbed by other inmate, followed prison policy and called for

back-up and medical personnel rather than immediately intervening); Blaylock v. Borden, 547 F. Supp. 2d 305, 308, 312 (S.D.N.Y. 2008) aff'd, 363 F. App'x 786 (2d Cir. 2010) (granting summary judgment in favor of prison officer; finding no deliberate indifference where, at outset of attack upon plaintiff by inmate wielding seventeen-inch metal pipe, officer, following prison safety protocol, "took reasonable measures to stop" attack by "immediately order[ing] the men to cease fighting and promptly call[ing] for officer assistance" rather than attempting to intervene).

Here, defendants have submitted undisputed evidence that PBSP policy and training dictates against ASU staff entering a cell containing an unrestrained inmate (see Vanderhoofven Decl. ¶ 2), and that, in the case of assaultive conduct, officers are trained to first issue verbal commands, and if unsuccessful, to then use chemical agents to stop the violence (see Andruss Supp'l Decl. ¶ 7). Further, it is undisputed that once Aguilar began attacking plaintiff, Andruss "immediately started yelling orders for the inmates to stop fighting and get down" (see Andruss Decl. ¶ 12), and, in accordance with their training, Kinney and Andruss each administered two bursts of pepper spray (see Kinney decl. ¶¶ 12, 13; Andruss Decl. ¶¶ 14, 16), after which Aguilar stopped attacking plaintiff (see Kinney Decl. ¶ 13). Under such circumstances, a reasonable trier of fact could not find Kinney and Andruss were deliberately indifferent in using pepper spray rather than entering plaintiff's cell and physically intervening.

Accordingly, to the extent plaintiff's claim is based on Kinney and Andruss's use of pepper spray rather than physical intervention, Kinney and Andruss are entitled to summary judgment.

### b. Vanderhoofven

It is undisputed that, on the day of the incident, Vanderhoofven was the Control Booth Officer who opened the cell door to permit Aguilar to enter the cell and then closed the door after Aguilar had entered. (See Vanderhoofven Decl. ¶ 6.) Plaintiff argues Vanderhoofven was deliberately indifferent because he "was aware of yelling and noise

coming from the vicinity of cell D-08 and activated the alarm," but did not "open the door to cell D-08 to rescue [plaintiff]." (See Opp'n at 21:7-9.) Vanderhoofven, however, has submitted a declaration stating he could not see what was happening inside plaintiff's cell (see Vanderhoofven Supp'l Decl. ¶ 5),[14] and that when he heard Kinney and Andruss yelling "get down," he "activated [his] personal alarm to summon more custody staff, and used [his] radio to inform Central Control there was a cell fight in D-Section" (see Vanderhoofven Decl. ¶ 7). Plaintiff submits no evidence to the contrary. Vanderhoofven further states that, in accordance with PBSP policy, he did not open the door nor could he or another officer go into the cell of an unrestrained inmate, as "inmates often hide stabbing and slashing weapons in their cells" and "have been known to stage cell-fights just to draw staff in for the purpose of attacking them." (See Vanderhoofven Supp'l Decl. ¶ 2.) Again, plaintiff submits no evidence to the contrary.

As discussed above, a correctional officer cannot be found to have been deliberately indifferent where, in response to prison violence, he follows prison policy in taking reasonable measures that consider officer safety. See e.g., Shields, 664 F.3d at 180-813. Here, given the above-discussed undisputed evidence submitted by Vanderhoofven, plaintiff has failed to raise a triable issue as to whether the measures taken by Vanderhoofven were anything other than reasonable.

Accordingly, Vanderhoofven is entitled to summary judgment on plaintiff's claim of deliberate indifference.

**2. Failure to Intercede**

"[O]fficers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." See United States v. Koon, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994) rev'd on other grounds, 518 U.S. 81 (1996). In such instances, the constitutional right violated by the "passive defendant" is the same as the right violated by

---

[14] According to Vanderhoofven, and undisputed by plaintiff, the cell door was solid except for a cuff port and "a narrow window of approximately four inches by thirty-six inches that runs vertically along the handle side of the cell door." (See Vanderhoofven Decl. ¶ 5.)

10

the defendant who actively commits the unconstitutional acts. See id. An officer may be held liable for failing to intercede, however, only where he/she knows a constitutional violation is occuring. See Ramirez v. Butte-Silver Bow Cnty., 298 F.3d 1022, 1029-30 (9th Cir. 2002) aff'd, 540 U.S. 551 (2004) (affirming summary judgment in favor of police officer, where officer did not intercede and stop fellow officers from executing defective search warrant he had no reason to know was defective). Moreover, "officers can be held liable for failing to intercede only if they had an opportunity to intercede." See Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000) (holding, where plaintiff alleged excessive force and failure to intercede, undisputed evidence precluded finding of liability as to "non-shooting officers who were present at the shootouts [but] had no 'realistic opportunity' to intercede").

### a. Kinney and Andruss

Plaintiff argues Kinney, even if not initially deliberately indifferent, is liable under the Eighth Amendment in failing to intercede when Andruss violated plaintiff's constitutional rights, because, rather than entering the cell to attempt to stop the assault, she issued verbal commands and used pepper spray. As discussed above, the undisputed evidence shows Kinney responded immediately and reasonably as the events unfolded. Consequently, Kinney cannot be found liable for failure to intercede. Further, although Andruss also moves for summary judgment on this part of plaintiff's claim, plaintiff's opposition only addresses Kinney's asserted failure to intercede. To the extent plaintiff intends to pursue such theory as against Andruss as well, the above analysis is equally applicable, as it is undisputed that the two defendants acted in unison in responding to the assault.

Accordingly, to the extent plaintiff's claim is based on a failure to intercede, Kinney and Andruss are entitled to summary judgment.

//

### b. Vanderhoofven

Plaintiff contends Vanderhoofven failed to intercede when he failed to open the door to plaintiff's cell. As discussed above, the evidence is undisputed that Vanderhoofven responded immediately and reasonably by activating his alarm to summon additional staff and using his radio to inform Central Control. (See Vanderhoofven Decl. ¶ 7.)

Accordingly, to the extent plaintiff's claim is based on a failure to intercede, Vanderhoofven is entitled to summary judgment.

## C. Qualified immunity

"Law enforcement officers, including prison guards, enjoy qualified immunity from civil damage suits unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Schwenk v. Hartford, 204 F.3d 1187, 1195-96 (9th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "In order to determine whether an official is entitled to qualified immunity, a court must (1) identify the right allegedly violated, (2) determine whether the right was 'clearly established,' and (3) determine whether a reasonable official would have believed his or her conduct to be lawful." Hamilton v. Endell, 981 F.2d 1062, 1066 (9th Cir. 1992) (overruled in part on other grounds).

Here, as discussed above, the record contains sufficient evidence from which a jury could determine Kinney and Andruss violated plaintiff's Eighth Amendment rights.[15] Additionally, at the time of the events in question, the law was clearly established that intentionally exposing an inmate to a risk of serious injury or harm constitutes a violation of the Eighth Amendment. See Robinson v. Prunty, 249 F.3d 862, 866 (9th Cir. 2001) (holding district court did not err in denying qualified immunity to prison guards; noting "the law regarding prison officials' duty to take reasonable measures to protect inmates from violence at the hands of other prisoners was 'clearly established'"). Lastly, no reasonable

---

[15] With respect to Vanderhoofven, as discussed above, plaintiff has failed to raise a triable issue as to any alleged violation of a constitutional right. Consequently, the Court does not address his claim of qualified immunity.

officer would believe that knowingly exposing an inmate to an attack from another inmate is lawful. See id. at 866-67 (holding "no reasonable prison official could have believed that his or her conduct was lawful" where defendant guards were aware that placing African-American inmates in yard with Mexican-American inmates "present[ed] a serious risk of violent outbreaks").

Accordingly, Kinney and Andruss are not entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is hereby GRANTED IN PART and DENIED IN PART, as follows.

1. To the extent plaintiff's claim is based on the theory that defendants were deliberately indifferent in failing to open the door to plaintiff's cell and/or enter to physically intervene to stop the assault, the motion is GRANTED.

2. To the extent plaintiff's claim is based on the theory that defendants failed to intercede, the motion is GRANTED.

3. To the extent plaintiff's claim is based on the theory that defendants, by placing a rival gang member in plaintiff's cell, were deliberately indifferent to a known risk of serious harm to plaintiff, the motion is GRANTED as to defendant Vanderhoofven and DENIED as to defendants Kinney and Andruss.

**IT IS SO ORDERED.**

Dated: June 19, 2013

MAXINE M. CHESNEY
United States District Judge